# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

| | |
|---|---|
| KELLY ANTEKEIER, <br>    Plaintiff, <br><br>       v. <br><br> LABORATORY CORPORATION OF AMERICA, <br>    Defendant. | Case No. 1:17-cv-786 |

## MEMORANDUM OPINION

At issue in this Family and Medical Leave Act ("FMLA")[1] case are the parties' cross-motions for summary judgment. Plaintiff, a former salesperson for defendant, suffered medical incidents requiring that she take two periods of FMLA leave. According to plaintiff, defendant (i) impermissibly interfered with her FMLA leave by contacting her on several occasions while she was on FMLA leave, and (ii) terminated plaintiff in retaliation for plaintiff having taken FMLA leave on two occasions. Defendant now seeks summary judgment on both claims. Plaintiff also seeks summary judgment on defendant's failure to mitigate affirmative defense, arguing that defendant has failed to present any evidence showing plaintiff failed to mitigate her damages.

Because there are disputed issues of fact with respect to plaintiff's retaliation claim and defendant's failure to mitigate defense, the cross-motions for summary judgment on those issues must be denied. But in contrast, there is no genuine dispute of material fact with respect to plaintiff's interference claim, and thus for the reasons that follow, defendant's motion for summary judgment on that claim must be granted.

---

[1] 29 U.S.C. § 2601 *et seq*.

# I.

The following facts are derived from the parties' statements of undisputed fact, most of which were not specifically or properly disputed. In this respect, both parties, consistent with Local Rule 56(B) and the Rule 16(B) Scheduling Order, submitted in connection with their motions for summary judgment a separately captioned section listing in numbered-paragraph form all material facts as to which the parties contend no genuine dispute exists. *See Antekeier v. Laboratory Corporation of America*, No. 1:17-cv-786 (E.D. Va. Aug. 30, 2017) (Order). Also consistent with the Local Rule and Scheduling Order, both parties provided "a separately captioned section within the[ir] brief[s] addressing, in numbered-paragraph form corresponding to the movant's section, each of the movant's enumerated facts and indicating whether the non-movant admits or disputes the fact with appropriate citations to the record." *Id*.

Given that the parties essentially complied with Local Rule 56(B) and the Scheduling Order, the following statement of facts is based on the parties' statements of undisputed facts and responses thereto. Where the parties dispute a material fact and cite supporting record evidence, this dispute is noted below.

- Defendant, Laboratory Corporation of America, a company engaged in the business of providing lab testing services to doctors and other healthcare providers, hired plaintiff, Kelly Antekeier, in March 2010.

- Plaintiff was originally hired as a Key Account Executive ("KAE"). In that role, plaintiff was responsible for assisting defendant's existing clients and attempting to expand business opportunities with those existing accounts.

- Because plaintiff performed well in her KAE position, she was promoted to Senior Marketing Executive ("SME") in 2013. This new position required plaintiff to seek out

new clients in addition to her continuing responsibility to assist existing clients and to manage their accounts. Plaintiff continued working in her SME role without incident for three years.

- In August 2016, plaintiff took two weeks of leave for sinus surgery, returning to work on August 17, 2016.

- On September 15, 2016, plaintiff collapsed in the course of a client visit and was then informed that the collapse was attributable to a brain aneurism requiring both surgery and FMLA leave.

- Accordingly, plaintiff took FMLA leave from September 15, 2016 to October 17, 2016.

- Plaintiff took a second period of FMLA leave from November 23, 2016 to December 13, 2016 to undergo surgery for her brain aneurysm. On November 29, 2016, plaintiff underwent brain surgery, and then remained on FMLA leave until December 13, 2016.

- During the two periods of FMLA leave, plaintiff received a number of telephone calls from individuals at her workplace.

- During the first period of FMLA leave, plaintiff received two telephone calls from a coworker asking plaintiff for a client's contact information, another two calls from another coworker asking for information for a new account plaintiff had opened prior to taking FMLA leave, and a telephone call from a third coworker to update plaintiff on a client leaving the company and to let plaintiff know that her supervisor had resigned.

- During both periods of FMLA leave, plaintiff's supervisors had plaintiff's work calls and emails forwarded to the supervisors instead of being sent to plaintiff. Furthermore, plaintiff admits that she was never told by either supervisor that she was required to work

3

while she was on leave. The record also reflects that plaintiff was never required to respond to or return any calls or emails.[2]

- During the second period of FMLA leave, plaintiff received several calls from her supervisors asking plaintiff about her medical condition and asking when plaintiff planned to return from leave. Plaintiff's new supervisor also left voicemails for plaintiff asking for client contact information. Plaintiff did not return these telephone calls, but instead responded to some via email. Plaintiff also received a call from a coworker asking plaintiff if plaintiff thought the company should hold a holiday party for a client. Plaintiff told her coworker that she thought the party was important and that the company should find someone to work the party. This was done; the party was held, but plaintiff did not plan, work on, or attend the holiday party. After returning from FMLA leave, plaintiff placed the bill for the party on her credit card merely to facilitate the billing process.

- On November 2, 2016, between plaintiff's first period of FMLA leave and her second, defendant's Vice President of Business, James Maruca, called plaintiff to a meeting to discuss complaints from two clients concerning plaintiff's conduct. The parties sharply dispute whether plaintiff's conduct complained of by clients actually occurred.

- One of the complaining clients, Dr. Chambers, contends he had attempted to establish an account with defendant. Plaintiff was assigned to follow-up and establish the account, but the account was not established even after several telephone calls. Maruca then sent another employee, Gloria Mann, to resolve the issue with Dr. Chambers. Mann visited

---

[2] *See* Antekeier Dep. at 255:11-14 ("Q. Okay. Did she – did [plaintiff's supervisor] ever say to you, you have got to work while you are out on leave? A. No."); Antekeier Dep. at 362:12-15 ("Q. Did anybody call you and say, from LabCorp and say, you're expected to review your e-mails? A. No.").

4

Dr. Chambers and reported to Maruca that Dr. Chambers complained about plaintiff discussing plaintiff's health issues with Dr. Chambers. For her part, plaintiff disputes that she ever met Dr. Chambers, and notes that she was on FMLA leave when Dr. Chambers made his requests for assistance in opening an account.

- Plaintiff claims that when she tried to explain to Maruca that plaintiff was on leave at the time of the Dr. Chambers incident, Maruca told plaintiff she was unprofessional and yelled at her, stating that "Nobody cares about your medical condition."

- At the November 2 meeting, Maruca also discussed complaints from a second client, Arlington Women's Center (the "Center"). One of defendant's employees, Denise Ramsey, learned from plaintiff that the Center intended to transition its business from defendant to a competitor. And in an effort to retain the client, Ramsey emailed the Center's practice administrator, who responded by complaining to Ramsey about plaintiff's improper behavior with the staff at the Center, including taking the staff out for happy hour, visiting the office for extended periods of time and discussing plaintiff's personal details with the staff. Plaintiff disputes the accuracy of the Center's complaint, and contends that her actions did not lead to the loss of the account, citing in support an email plaintiff received from the Center's practice administrator.

- Approximately a month after plaintiff returned from her second period of FMLA leave, on January 11, 2017, plaintiff met with her supervisors about another alleged unprofessional act. At the meeting, plaintiff's supervisors discussed an incident in which two of plaintiff's coworkers told plaintiff's boss that plaintiff had threatened to do nothing to prevent a client from ending its relationship with defendant. Plaintiff had allegedly told her coworkers that because defendant had not been a "team player" with

respect to plaintiff's leave, plaintiff was not going to be a team player either. Plaintiff denies that she made these statements and argues that defendant did not follow its own policy in investigating the incident.

- On January 20, 2017, plaintiff, her supervisor Ramsey, and a coworker named Gretchen Morris had a loud and disruptive argument at the Charlotte Airport. The parties dispute exactly what occurred during the argument and specifically the parties dispute who yelled or raised their voice at whom. After the dispute, Ramsey obtained statements from Morris and Michael Sabatino, another employee who was present, indicating that plaintiff had yelled at Morris.

- After returning from Charlotte, Maruca and Ramsey decided to terminate plaintiff, citing her lack of professionalism, as evidenced by the incident at the Charlotte Airport, and other earlier incidents.

## II.

Analysis of defendant's summary judgment motion on plaintiff's FMLA interference claim properly begins with the terms of the statute. Specifically, the FMLA prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). To establish a claim for FMLA interference, a plaintiff must show that "(1) she is entitled to an FMLA benefit; (2) her employer interfered with the provision of that benefit; and (3) that interference caused harm." *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015). Although the parties do not dispute that plaintiff was entitled to FMLA leave, the parties do dispute whether the factual record reflects any actionable interference with plaintiff's FMLA leave.

6

Although, the FMLA provides that an employer may not "interfere with . . . the employee's exercise of his or her right[s]" under the FMLA there is no statutory definition or elucidation in the FMLA as to what constitutes interference. 29 U.S.C. § 2615(a)(1). A sensible construction of actionable interference in the context of the FMLA plainly does not include situations where an employee on leave was contacted by her employer or a co-employee for some purpose other than to do work. For example, the FMLA's prohibition against employer interference is not triggered by a supervisor's telephone call to wish an employee on leave a happy birthday or for some other non-work related reason. It is equally clear that actionable FMLA interference does not include *de minimis* work-related contact, such as a telephone call to request client contact information or a call to update an employee about news in the workplace. These examples stand in stark contrast to situations in which the employer asks or directs an employee to do work while that employee is on FMLA leave. Contacts that amount to asking an employee to work, such as requesting that an employee prepare a memorandum or organize events for a client, likely cross the line into impermissible interference with FMLA leave. The line between contacts constituting interference and contacts that do not amount to interference, is indistinct, as there is no statutory guidance and little decisional law on the issue. The few cases to address this question recognize that "fielding occasional calls about one's job while on leave is a professional courtesy that does not abrogate or interfere with the exercise of an employee's FMLA rights." *Reilly v. Revlon*, 620 F. Supp. 2d 524, 537 (S.D.N.Y. 2009). Similarly, the Third Circuit affirmed the grant of summary judgment on an FMLA interference claim, noting that the emails requesting paperwork were *de minimis*. *See O'Donnell v. Passport Health Communications, Inc.*, 561 Fed. App'x 212, 216-18 (3d Cir. 2014). *See also Kesler v. Barris, Sott, Denn & Driker, PLLC*, 482 F.Supp.2d 886, 910 (E.D. Mich. 2007) (holding that repeated

contacts with plaintiff during FMLA leave does not "amount[] to denial of FMLA benefits" where plaintiff was not asked to do work).

The Fourth Circuit has not yet provided guidance on the question of when an employer's contact with an employee during an employee's FMLA leave crosses the line into impermissible interference. Yet there is no reason to believe that the Fourth Circuit would deviate from the sensible principle that actionable interference is not triggered by contacts unrelated to work, or if related to work, amounting to no more than *de minimis* work-related contact. This principle applied here points persuasively to the conclusion that plaintiff's contacts with co-employees and supervisors while plaintiff was on FMLA leave do not amount to actionable interference with plaintiff's FMLA leave. The undisputed record evidence, including plaintiff's deposition testimony, demonstrates that defendant's employees contacted plaintiff during her two periods of FMLA leave in the following ways:

> *First Leave* –
> (1) one co-worker called plaintiff twice to ask for client contact information
> (2) another co-worker called plaintiff to request information about a client account plaintiff had opened immediately before taking FMLA leave
> (3) plaintiff's supervisor called plaintiff to check on her medical status, ask her when plaintiff planned to return from leave. The supervisor called plaintiff a second time to inform plaintiff that the supervisor was resigning her position.
> (4) Maruca left voicemails for plaintiff.
> *Second Leave* –
> (1) several calls from plaintiff's supervisors asking plaintiff about her medical condition and when she planned to return.
> (2) several calls requesting client contact information for plaintiff's accounts
> (3) one call regarding a holiday party and seeking plaintiff's opinion on whether plaintiff thought the company should hold the party.

These contacts clearly fall short of FMLA interference.[3] Most of the calls either requested basic information about clients or updated plaintiff on occurrences at work. Also important to the

---

[3] Plaintiff stated at her deposition she received some other work-related calls, but could not recall how many other calls she received or the content of other calls. It is plaintiff's burden to point to record evidence supporting an

8

analysis is plaintiff's admission that none of defendant's employees told her that she needed to work while she was on FMLA leave or even that plaintiff needed to respond to emails or telephone calls she received.[4] Plaintiff says that her supervisors called her, but she does not say, and the record does not show, that she was ever asked to work.[5]

Seeking to avoid this conclusion, plaintiff argues that the FMLA imposes an affirmative duty on employers to tell an employee that he or she does not need to work while on FMLA leave. This argument is unpersuasive; there is no basis for such a proposition in either the language of the FMLA or the FMLA case law. Importantly, plaintiff admits that she was never asked to perform work while she was on FMLA leave and that she did not work while on leave, making clear that plaintiff understood she was under no obligation to perform work-related tasks while on FMLA leave.

Next, plaintiff argues that the FMLA requires an employer to avoid *any* contact with an employee on FMLA leave that might induce an employee to work. Again, this proposition finds no support in either the text of the FMLA or FMLA case law. Furthermore, it bears repeating that the undisputed factual record shows that plaintiff was not asked to do any work while on leave, and that the contacts between plaintiff and her supervisors and co-employees were either de minimis or not work related.

---

interference claim and she cannot establish it by merely referring to vague discussions of work-related calls in her deposition. To the extent there were other calls to plaintiff that plaintiff could not recall, these calls are not properly considered because there is no record evidence to support a finding that those calls would constitute interference with her FMLA leave. *See Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 549 (4th Cir. 2006).

[4] *See* Antekeier Dep. at 255:11-14 ("Q. Okay. Did she – did [supervisor] ever say to you, you have got to work while you are out on leave? A. No."); Antekeier Dep. at 362:12-15 ("Q. Did anybody call you and say, from LabCorp and say, you're expected to review your e-mails? A. No.").

[5] And to the extent that plaintiff chose to respond to calls or emails, such voluntary actions on the part of plaintiff do not amount to actionable interference by defendant. *See Massey-Diez v. University of Iowa Community Med. Services, Inc.*, 826 F.3d 1149, 1158-59 (8th Cir. 2016) (holding that a plaintiff cannot present an interference claim where plaintiff engaged in work voluntarily while on leave).

To support her FMLA interference claim, plaintiff points to one request from defendant other than the few emails and telephone calls, namely a request by defendant that plaintiff organize and pay for a holiday party for clients while she was on leave. This contention is refuted by the record, which shows that plaintiff was not required to plan the holiday party, did not plan or attend the holiday party while she was on FMLA leave, did not pay for the holiday party while she was on leave, and only placed the charge for the holiday party on her credit card after she returned from leave in order to facilitate reimbursement for the holiday charges. Specifically, plaintiff's deposition testimony shows that when plaintiff was asked "Q. And – and could you go [to the holiday party]?" plaintiff responded "I was out." There is no mention that plaintiff attended the holiday party. Later, in a portion of the transcript not cited by plaintiff, plaintiff explained that the holiday party expense was transferred to her credit card because plaintiff was the individual assigned to the client account and the transfer of the expense to plaintiff's card was necessary for the proper reimbursement to take place. *See* Antekeier Dep. at 370-71. Ultimately, after plaintiff left defendant's employ plaintiff was reimbursed for the charge placed on her credit card. *See id.* at 372:7-9. Thus, the record establishes that employees other than plaintiff planned, worked, and attended the holiday party and plaintiff only had the expense of the party charged to her credit card for convenience. Thus, plaintiff cannot establish interference with her FMLA leave based on the holiday party.

Finally, it is worth noting that plaintiff has also failed to present any evidence that she was harmed as a result of any of defendant's alleged interference, a fact consistent with the conclusion that defendant's actions did not amount to interference. Plaintiff presents no evidence that she lost compensation as a result of defendant's alleged interference, and with

good reason: the actions of her employer did not amount to actionable interference with plaintiff's FMLA leave and plaintiff's inability to show harm is consistent with this conclusion.

To be sure, it is important to give effect to the FMLA's statutory prohibition on interference with an employee's FMLA leave. An employer cannot ask an employee to do work while he or she is on FMLA leave, but an employer may contact an employee to update an employee on events in the office or to ask the employee when he or she plans to return to work. Because the undisputed factual record in this case clearly demonstrates that defendant's contacts with plaintiff during plaintiff's FMLA leave were either de minimis or unrelated to work, plaintiff's FMLA interference claim fails as a matter of law. As such, summary judgment in favor of defendant on plaintiff's FMLA interference claim must be granted.

### III.

Defendant also seeks summary judgment on plaintiff's FMLA retaliation claim. The FMLA makes it unlawful for "any employer to discharge or in any manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). To establish a claim for FMLA retaliation, a plaintiff must show "that [she] engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to plaintiff's protected activity." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016) (internal quotations and citations omitted). Defendant argues that plaintiff has failed to present evidence sufficient to demonstrate the requisite causal connection between plaintiff's protected activity and plaintiff's termination. Alternatively, defendant argues that plaintiff has failed to present evidence showing that defendant's legitimate non-discriminatory reason for terminating plaintiff was pretextual. Defendant's argument fails in both respects.

Defendant's argument with respect to causation rests entirely on its reading of the law related to temporal proximity. According to defendant, the gap between plaintiff's leave and her termination is too great to support an inference of causation. Plaintiff was terminated on February 1, 2017, approximately four and a half months after plaintiff first took FMLA leave and approximately two and a half months after plaintiff began her second period of FMLA leave. Plaintiff returned from FMLA leave on December 13, 2016, and was terminated one and a half months after returning.

The Supreme Court has stated that in "cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (internal quotation marks omitted). The Fourth Circuit has held that a six week gap between returning to work and termination may be sufficient to support causation and create a triable issue of fact for the jury. *See King v. Rumsfeld*, 328 F.3d 145, 151 n. 5 (4th Cir. 2003).

Plaintiff's termination occurred six weeks after she returned from her second period of FMLA leave. That alone would be sufficient to demonstrate causation, but plaintiff also presents record evidence demonstrating that other retaliatory actions taken in close proximity to both plaintiff's periods of leave buttresses plaintiff's showing of causation.[6] According to plaintiff, the complaints about plaintiff's unprofessional conduct were issued in retaliation for her having taken leave and those occurred within a few weeks of her return from both periods of leave. Given that plaintiff was disciplined only after returning from leave, and then faced a pattern of

---

[6] Although the complaints about plaintiff's professionalism would not qualify as actionable adverse employment actions on their own, the proximity of those complaints to plaintiff's termination is relevant evidence of causation. *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650-51 (4th Cir. 2007) (holding "continuing retaliatory conduct" between protected activity and termination is "sufficient to show a causal link between" protected activity and termination).

12

disciplinary actions between her first and second leaves and immediately after returning from her second leave, plaintiff has presented evidence sufficient to establish a triable issue of fact as to causation.

Defendant also argues that plaintiff has failed to present sufficient evidence to show that defendant's legitimate, non-discriminatory reason for firing plaintiff was pretextual. Plaintiff "bears the burden of establishing that the employer's proffered explanation is pretext for FMLA retaliation." *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006). According to defendant, there is no evidence that defendant's decisionmakers did not honestly believe plaintiff had acted unprofessionally in relation to certain clients or towards coworkers.

There is sufficient evidence in the record that would allow a reasonable jury to conclude that defendant's proffered reason for plaintiff's termination – her alleged unprofessional conduct – was pretextual. First, defendant does not dispute that plaintiff was a high performer in her sales role and that there was only one professionalism-related complaint about plaintiff before her leave. The timing of the subsequent professionalism complaints – occurring only between plaintiff's first FMLA leave and her second, and then again after plaintiff returned from FMLA leave a second time – gives rise to an inference that the professionalism complaints were prompted by plaintiff's FMLA leave, given that she had performed so well prior to that time.

Yet another problem for defendant is that the record shows that at least some of the professionalism complaints lacked a basis in fact and that defendant violated its own policies in conducting its investigation of plaintiff's alleged unprofessionalism. The first professionalism complaint against plaintiff related to her alleged failure to follow-up with Dr. Chambers, one of defendant's clients. The undisputed record reflects that plaintiff was not responsible for working with Dr. Chambers before plaintiff went on FMLA leave, and moreover, plaintiff has presented

13

evidence that she never met with or knew Dr. Chambers.  Defendant presents testimony from one of its employees that the employee had discussed plaintiff's failure to respond to Dr. Chambers calls.  Thus, clearly the parties dispute the facts underlying the professionalism complaints related to Dr. Chambers.

The second professionalism complaint against plaintiff was related to plaintiff's work with the Center.  In this respect, defendant presents evidence, in the form of deposition testimony from defendant's employees that the client complained about plaintiff conduct.  Plaintiff, however, has presented an email from the client stating that there were no complaints about plaintiff's professionalism or about plaintiff personally.  In response, defendant argues that the client communicated the complaint in confidence.  Whether plaintiff's or defendant's evidence should be credited with respect to this professionalism complaint is a disputed issue of fact for the jury, and important to a decision  about whether defendant's reasons for terminating plaintiff were legitimate or a pretext for unlawful FMLA retaliation.

There are also factual disputes with respect to the other two alleged instances of unprofessional conduct by plaintiff.  After returning from her second leave, plaintiff was given a written warning related to an allegation that plaintiff had said she would let a client leave defendant because defendant was not a "team player."  Plaintiff disputes the factual validity of this written warning, presenting evidence that defendant did not follow its policies for investigating this incident.  The final act of alleged unprofessionalism by plaintiff was an argument that occurred between plaintiff and a coworker at the Charlotte Airport.  The parties vigorously dispute what occurred during the altercation, with plaintiff claiming that she spoke calmly with her coworker while her coworker berated her.  Defendant takes a contrary view of this incident.  Plaintiff's supervisor was present and had employees fill out contemporaneous

14

reports supporting defendant's position, but as plaintiff points out plaintiff's supervisor, not the employees who witnessed the argument, drafted the account of the event in those records.

In sum, there are genuine disputes of material fact with respect to the validity of the reasons proffered by defendant for terminating plaintiff. To the extent that plaintiff presents record evidence showing that a number of the reasons given by defendant for her termination were false and that defendant did not follow its own policies in investigating the alleged incidents of unprofessional conduct, plaintiff has provided enough evidence to show that defendant's reasons may have been a pretext for unlawful discrimination. As such, summary judgment on plaintiff's FMLA retaliation claim must be denied.

**IV.**

Plaintiff seeks summary judgment on defendant's failure to mitigate affirmative defense. A plaintiff in an employment discrimination case must mitigate damages by diligently "seeking and accepting new employment substantially equivalent to that from which he was discharged." *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir.1985). Failure to seek new employment precludes an award of back pay for the period during which employment was not sought. *See id*. The duty to mitigate is not without limits, however. For example, a plaintiff "need not go into another line of work, accept a demotion, or take a demeaning position." *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982). Defendant bears the burden of demonstrating that plaintiff has failed to fulfill the duty to mitigate. *See Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995).

Plaintiff argues that there is no genuine dispute of material fact with respect to her mitigation of damages. Yet, the record clearly shows that plaintiff took a number of steps to mitigate her damages. Specifically, plaintiff applied to between 65 and 70 jobs over an 8 month

15

period, received two interviews and one job offer. Plaintiff did not accept the job offer because she believed she was bound by a non-compete clause in her contract with defendant. According to plaintiff, these efforts are sufficient as a matter of law to show that she has satisfied her duty to mitigate and diligently sought new employment.

Whether plaintiff's efforts to mitigate her damages were sufficient is a question of fact for the jury. Although it is true that plaintiff applied to comparable positions and sought new work, whether those actions were sufficient to constitute mitigation is in dispute. Both parties can present evidence about mitigation efforts to the jury and allow the jurors to decide whether mitigation was in fact sufficient. As such, summary judgment in favor of plaintiff with respect to defendant's failure to mitigate affirmative defense is inappropriate.

V.

For the foregoing reasons, defendant's motion for summary judgment must be granted with respect to plaintiff's FMLA interference claim and denied with respect to plaintiff's FMLA retaliation claim, and plaintiff's motion for summary judgment on mitigation must be denied.

An appropriate Order will issue.

Alexandria, Virginia
February 8, 2018

/s/
T. S. Ellis, III
United States District Judge